(127 So. 388)

**SIZELER et al. v. SIZELER.**

No. 30004.

March 5, 1930.

Rehearing Denied March 31, 1930.

Edward Rightor and S. S. Goldman, both of New Orleans, for appellant.

Howell Carter, Jr., and H. W. Robinson, both of New Orleans, for appellees.

LAND, J.

Otto Sizeler married his niece, Miss Annie Fels, in Providence, R. I., on October 14, 1913, under a statute of that state which permits a marriage among the Jews, within the degrees of affinity or consanguinity allowed by their religion. Chapter 243, General Laws of Rhode Island, 1909, §§ 1–4, and 9.

The contracting parties were of the orthodox Jewish faith. They were married in the city of Providence by Rabbi Bachrach, as under the Rabbinical law the marriage of uncle and niece is sanctioned. See testimony of Rabbi Mendel Silber, T. 135.

Otto Sizeler and his wife were residents of the city of New Orleans at the time of their marriage. They returned to that city after their marriage, and resided there until the death of Otto Sizeler, March 26, 1928.

The estate of decedent is insolvent. He left two policies of life insurance of $5,000 each, in which "Annie F. Sizeler, wife of insured" is named as beneficiary.

The plaintiffs, the three sons of Otto Sizeler by his first marriage, have instituted the present suit to enjoin the insurance company from paying, and the defendant, Mrs. Annie Fels Sizeler, from receiving payment of the amount of the policies in question.

The grounds for the injunction are: That the marriage in Providence, R. I. of Otto Sizeler to Miss Annie Fels, his niece, was in violation of a law of the state of Louisiana prohibiting marriage between uncle and niece; that the marriage was contracted to evade the laws of this state and was in bad faith; and that the marriage is null and void and without legal effect, since the contracting parties were residents of the state at the time of their marriage, and returned to the state to reside shortly thereafter. R. C. C. arts. 94, 95, 113.

It is therefore alleged by plaintiffs that defendant was the mere concubine of Otto Sizeler, and, as such, was incapable of receiving the entire insurance of $10,000, for the reason that *the policies of life insurance were donations mortis causa,* and were made in violation of article 1481 of the Civil Code, which declares that those who have lived in open concubinage are incapable of making donations to each other of immovables, and that donations of movables are limited to one-tenth of the value of their estates.

Under our view of the case, we do not find it necessary to pass upon the validity of the marriage contracted between Otto Sizeler and his niece in the state of Rhode Island, nor to determine whether the same was entered into in good faith by either of the contracting parties.

We have arrived at this conclusion for the reason that the rules of our Civil Code relating to donations inter vivos and mortis causa have no application to life insurance policies, and there is no law of this state that prohibits any person from insuring his life in favor of any beneficiary that he may select.

In the case of Mary Ticker v. Metropolitan Life Insurance Co., 11 Orleans App. 55 (1914), Mr. Justice St. Paul, then a judge of the Court of Appeals for the parish of Orleans, in reviewing our jurisprudence on the subject, said in part:

"As we appreciate the jurisprudence of this State, a life insurance policy is a contract sui generis, *governed by rules peculiar to itself,* the outgrowth of judicial precedent and not of legislation.

"For although it is quite certain that such a contract, when wholly gratuitous as to the beneficiary, can be assimilated only to a donation either inter vivos or mortis causa (C. C. 1773, 1467), *yet the Supreme Court of the State has uniformly refused to apply to life insurance policies the rules applicable to donations,* with the single exception to be found in Ins. Co. v. Neal, 114 La. 652, 38 So. 485. (Italics ours.)

"Thus the Court has repeatedly refused to apply to such policies the provisions of the Civil Code relative to donations inter vivos,

to-wit, that they are revocable when made to one's husband or wife, and subject to collation when made to one's children or descendants. C. C. 1749, 1228; Pilcher v. Ins. Co., 33 La. Ann. 322; Putnam v. Ins. Co., 42 La. Ann. 739, 7 So. 602; Lambert v. Ins. Co., 50 La. Ann. 1027, 24 So. 16; Vinson v. Vinson, 105 La. 31, 29 So. 701; Succ. of Roder, 121 La. 694, 46 So. 697, 15 Ann. Cas. 526.

"And a fortiori the Court has refused to apply to such policies the fundamental principle applicable to donations mortis causa, to-wit, that such donations are without avail until after payment of the debts of the deceased; the court holding in every instance *that the proceeds of such policies form no part of the estate of the deceased, and inure to the beneficiary directly and by the sole terms of the policy itself.* (See the authorities above quoted; also Succ. Kugler, 23 La. Ann. 455; Succ. of Hearing, 26 La. Ann. 326; Succ. of Clark, 27 La. Ann. 269; Succ. of Bofenschen, 29 La. Ann. 714; Tutorship of Crane, 47 La. Ann. 896, 17 So. 431; Succ. of Emonot, 109 La. 359, 33 So. 368)."

As the proceeds of life insurance policies form no part of the estate of the deceased, and inure to the beneficiary *"directly and by the sole terms of the policy itself,"* the right of the defendant to the avails of the policies in this case does not arise from legal coverture, nor from the civil effects of marriage contracted in good faith, but solely from the terms of the policies in which she has been named the beneficiary by the decedent. Whether the marriage of defendant to Otto Sizeler was valid or invalid has nothing to do with the case, and whether such marriage produced civil effects or not, as the result of the good faith of defendant in contracting it, is also beside the question.

Since the estate of the de cujus was insolvent, and as the proceeds of the policies in

this case formed no part of his estate, it is difficult to conceive that there was anything in his succession to be disposed of by donation mortis causa unless, perchance, donations of this character may spring from such stuff as dreams are made of. As said in the Succession of Hearing, 26 La. Ann. 326: "A policy of insurance *is not a piece of property;* it is the evidence of a contract, the contract being that a certain sum of money will be paid upon the happening of a certain event, to a particular person, who is named in the policy, or who may be the legal holder thereof."

In New York Life Insurance Co. v. Neal, 114 La. 652, 38 So. 485, the Supreme Court of Louisiana applied for the first time to a life insurance policy the provisions of our Civil Code relative to donations, which limit a donation in favor of a concubine to one-tenth of the donor's estate. C. C., art. 1481. As this case cannot be reconciled with the long line of decisions which preceded and followed it, all holding that the policy or its proceeds never formed any part of the estate of the deceased, the decision in the Neal Case is clearly in conflict with the settled jurisprudence of the state and is overruled.

Indeed, the writer of the opinion in the Neal Case, in the earlier case of Vinson v. Vinson, 105 La. 31, 29 So. 701, 702, held contrary to the doctrine laid down in the Neal Case. In the Vinson Case, decedent left *five* forced heirs. He also left a life insurance policy for $3,000, payable to only *four* of these children. The fifth child, through its tutrix, demanded that the other children be compelled to collate the proceeds of the policy. The writer of the opinion in the Neal Case, as the organ of the court in the Vinson Case, said:

"Plaintiff invokes the laws regarding collation as affording ground to compel the benefi-

ciaries to account to plaintiff for an heir's portion. Turning to the articles of the Revised Civil Code, we find that they set forth collation as being the supposed or real return to the mass of the succession which the heir is required to make of property which he has received beforehand on his share, in order that it may be divided with the other effects of the succession. *This implies a right in the estate to collation of property owned by the de cujus. It arises from the fact that it is considered as having passed * * * to the heir. Here there is nothing of the sort. * * * There was no gift of any kind made and no benefit conferred by the policy of insurance, which, under our jurisprudence, can be considered as a gift or benefit subject to demand for return by the co-heir not named in the policy, and who was not born at the time it was issued."* (Italics ours.)

■ We do not find it legally possible to hold that a life insurance policy in which a concubine is named the beneficiary is *a donation mortis causa,* and is subject to the rules in our Civil Code applicable to such donations, but that this is not the rule as to any other beneficiary designated in such policies. In the absence of express legislation on the subject, we have no judicial authority or power to draw a distinction between the classes of beneficiaries named in life insurance policies.

Judgment in the lower court was rendered in favor of plaintiffs, declaring the marriage between Otto Sizeler and Miss Annie Fels null and void and contracted in bad faith, and decreeing defendant incapable of receiving the proceeds of the policies, except to the amount of one-tenth part thereof.

The judgment further decreed the payment to plaintiffs of nine-tenths of the proceeds of the policies.

For the reasons assigned, it is ordered that the judgment appealed from be annulled and reversed.

It is now ordered that the demands of plaintiffs be rejected, and that this suit be dismissed at plaintiffs' costs.

ST. PAUL, J., dissents.

O'NIELL, C. J. (concurring).

I subscribe to the decree in this case and to the ruling that the taking out of life insurance is not a donation by the insured to the beneficiary, but I am also firm in the opinion that, according to the ruling in Texada v. Spence, 166 La. 1020, 118 So. 120, 62 A. L. R. 281, the relation or status of the insured and the beneficiary named in the policy of insurance was not a state of concubinage, even though the marriage was not valid in this state.

THOMPSON, J. (dissenting).

I cannot subscribe to the doctrine announced in the opinion in this case, concurred in by the Chief Justice and the four other Justices, which is that a contract of insurance is sui generis and that there is no law in this state which prohibits a person from insuring his life in favor of his concubine.

If there is any principle of law that is settled beyond controversy, it is the principle that all contracts made in violation of law, good morals, and public policy are utterly null and void, without any legal effect, and will not be enforced by a court of justice.

Chief Justice Marshall in Armstrong v. Toler, 11 Wheat. 258, 271, 6 L. Ed. 468, said:

"Questions upon illegal contracts have arisen very often, both in England and in this country; and no principle is better settled, than that no action can be maintained on a

contract, the consideration of which is either wicked in itself, or prohibited by law."

And this has been the uniform jurisprudence of this state as well as every other state in the land.

And where a contract is illegal, immoral, or contrary to public policy, the court will take notice of that fact and refuse to lend its aid in enforcing it, without any plea or suggestion from the litigants.

I feel quite sure that no case can be found in any court in any country which has recognized the validity of a contract entered into in violation of law, good morals, and public policy on the pretense that such contract was sui generis.

Courts universally look to the substance of contracts rather than to the form or the name by which they are called.

That a policy of insurance is a contract there can be no doubt, and it makes no difference whether the stipulation naming a certain person beneficiary is called a donation or is given some other name, or, for expediency and convenience, is called sui generis. If the contract is illegal, immoral, or contrary to public policy, it ought not to be recognized and given effect by the courts under the pretext that, although illegal, immoral, and contrary to public policy, the contract is sui generis peculiar unto itself.

That the contract of insurance in this case by which the insured named the defendant as beneficiary, is an illegal one and contrary to good morals and public policy, will readily be conceded by any one with an open mind who will give the matter one moment's consideration.

The insured was the uncle of the party named as beneficiary. The two were domiciled in this state. They had their actual residence in this state. They knew it was

against the laws of this state for an uncle to marry his niece. In an attempt to evade this prohibition of our law, they left the state in order to find some state where there was no legal impediment to their marriage.

After trying one or more states unsuccessfully, they finally found one, Rhode Island, the laws of which made an exception in favor of Jews, and were there married.

They returned to Louisiana, their domicile, and cohabited as husband and wife up to the death of the putative husband.

That this pretended marriage was in violation of express law, that the cohabitation constituted concubinage and rendered both parties subject to a prosecution for absolute felony defined as incest, would not for a moment be questioned by any one.

Article 95 of the Civil Code (1870) in express terms prohibits a marriage between uncle and niece.

And Act No. 9 of 1902 repeats the prohibition, and further declares that no marriage contracted in contravention of the statute in another state by citizens of this state shall have any legal effect in this state.

And to make the public policy of the state more definite and certain, if such was necessary, the Legislature, by Act No. 151 of 1914, declared that if any person residing and intending to continue to reside in this state, who is disabled or prohibited from contracting marriage under the laws of this state, shall go into another state, territory, district, possession, or country and there contract a marriage prohibited and declared void by the laws of this state, such marriage shall be null and void for all purposes in this state.

Not content with the civil statutes prohibiting the marriage between persons within the degrees of consanguinity designated in the statutes, the Legislature adopted Act No. 78

of 1884 which declares that whoever shall hereafter knowingly intermarry, or cohabit without marriage, being within the degrees of consanguinity within which marriage is prohibited by articles 94 and 95 of the Revised Civil Code, shall be deemed guilty of incest and on conviction thereof shall suffer imprisonment at hard labor for not less than ten years nor more than twenty years.

In view of these statutes and the public policy of the state as fixed in the statutes, the cohabitation between the parties can be regarded in no other light than that of open concubinage.

The Century Dictionary defines concubinage as the act or practice of cohabiting without legal marriage.

The Encyclopedia Brittanica defines concubinage as living together as man and wife without legal marriage.

The law dictionaries of Black and Bouvier define concubinage as the act or practice of cohabiting in sexual intercourse without the authority of law or a legal marriage.

Webster defines concubinage as the cohabiting of a man and woman who are not legally married.

The foregoing definitions are found in the case of Succession of Jahraus, 114 La. 459, 38 So. 417.

The court, after citing such definitions, said that such is and has always been the accepted meaning of the word "concubinage."

From what has been said, the conclusion is inescapable that the marriage, which is regarded as a civil contract, was illegal, immoral, and contrary to public policy, and that the cohabitation following such marriage had no other status than that of open concubinage.

I repeat again that the insurance was likewise a contract in which the insured contracted for and on behalf of his partner with whom he was living in a state of incestuous concubinage.

I say, therefore, that both the contract of marriage and the contract of insurance, in so far as it named the concubine as beneficiary, are absolute nullities as being illegal, immoral, and contrary to public policy.

I find no fault with the decisions cited in the opinion handed down which hold that policies of life insurance, or the proceeds of such policies, form no part of the insured's estate where such policies name a particular beneficiary who survives the insured, and who was capable of accepting.

Those cases, however, have not the remotest application to this case. In all of those cases, a beneficiary was named who was capable of accepting under the policy, and the person insured had the legal and moral right to name such beneficiary.

The opinion of the court does not cite any case from the courts of this state, or from any other state, where a concubine living in open concubinage has been permitted to take more than the percentage allowed by the Code against the right and claim of forced heirs of the insured.

The Vinson Case, 105 La. 30, 29 So. 701, cited in the opinion, was a contest between lawful heirs over the proceeds of a life policy insuring the life of their father, and the issue was whether certain of the heirs who had been named beneficiaries to the exclusion of another heir should collate, and the court held that the amount received belonged to the beneficiaries and was not subject to collation.

The case has no application whatever to this case. Whether the policy in that case was

a donation or some other sui generis contract was of little importance.

In the case of New York Life Insurance Co. v. Neal, 114 La. 652, 38 So. 485, 487, a policy had been taken out by Shinckle in favor of his concubine. At the death of the insured, the concubine sought to collect the insurance. Her claim was opposed on behalf of the lawful minors of the insured, and the court held that the concubine should recover one-tenth.

"In our view, the designation of the beneficiary named, for many reasons, was a prohibited act. If she could not receive by donation, she could not receive by designation in an insurance policy. * * *

"We have therefore considered the stipulation in the light of a donation. Considered strictly as an insurance, it is still a gratuity under the guise of insurance. Where is the lawful consideration? There is absolutely none.

"Practically there is no difference between a donation, a gratuitous stipulation pour autrui, and gratuitous insurance. An owner of property, head of a family, cannot divest himself by insurance upon his life of all his property, to the injury of his children, and in violation of good morals and public policy. If, in insuring, he violates the prohibition in question, the law strikes down the insurance as effectually as it would a donation or a gratuitous stipulation pour autrui."

What was said in that case is peculiarly applicable to the instant case.

If Sizeler had donated his immovables or all of his movables, either inter vivos or mortis causa, to his partner in concubinage, we apprehend that this court would not have hesitated to reduce the donation to the amount allowed by law.

If that be true, it seems to me to be utterly inconsistent to say that the insured in this case can be permitted to give as a gratuity the whole of the insurance on his life to his incestuous paramour, to the prejudice of his three lawful children.

As said in the Neal Case supra:

"It should not be possible to disregard obligations to one's offspring by insuring, and at the same time strike down donations, where it is manifest that the former may be made as effective as the latter to accomplish a purpose the law reprobates."

So far as we have been able to find, the ruling in the Neal Case has never been departed from or repudiated by this court or any other appellate court in this state until the present case. And upon what basis is it now overruled? Simply and only because a contract of insurance is sui generis, and there is no law of morals or of public policy forbidding a man to insure his life in favor of his concubine.

In the case of Middleton v. Insurance Co. 7 Orleans App. p. 122, that court, through Judge St. Paul, said: "Under the jurisprudence as we read it, a man may not insure his life in favor of his concubine. * * *

"If he do so it will be regarded as a donation and reduced to one-tenth of the amount of his estate. The balance remaining will be distributed as part of his succession," citing the Neal Case.

In the Middleton Case, Judge St. Paul made clear the distinction between the case he was considering, the Neal Case, and that of Succession of Johnson, 115 La. 20, 38 So. 880.

The ruling in the Johnson Case, he said, does not affect the general principle. "That was a case sui generis; the deceased had neither wife nor child, there was no impediment to a marriage between the parties had they seen fit to contract one; the policy provided that the premium should be paid by the concubine and she had paid them all, she had,

been, not only concubine, but faithful nurse and serving woman to the deceased. * * *

"But these circumstances show that there was very little in the shape of gratuity so far as she was concerned."

The opinion in the instant case takes, as a basis for overruling the Neal Case, certain expressions of Judge St. Paul in Mary Ticker v. Metropolitan Life Insurance Co., 11 Orleans App. page 59, on rehearing.

That was a contest over the proceeds of an insurance policy between the mother of the insured on the one side and the widow and children of the insured on the other side.

The policy had been taken out originally in favor of the insured's wife, but was changed subsequently and made payable to his mother.

On the original hearing, it was held that the assignment of the policy or substitution of a new beneficiary made wholly without consideration was a donation and, as such, invalid if the formalities prescribed for the making of donations were not observed.

On rehearing, the court, through Judge St. Paul, found that the policy reserved to the insured the right to change the beneficiary at will and without the consent of the wife, the original beneficiary. That the change was correct and in proper form and the court had no other alternative but to award the proceeds to the beneficiary last-named, for the contract being lawful must be given its effect, and the court said, for the purpose of defeating the intention of the parties, it could not apply to the contract provisions of law governing contracts of a different nature.

It is true that the court said that a life insurance policy is a contract sui generis, governed by laws peculiar to itself, the outgrowth of judicial precedent and not of legislation.

But it must be remembered that the court was dealing with a lawful contract of insurance with respect to both the original beneficiary and the substituted one, each of whom was capable in law of receiving the insurance, and quoad that kind of a contract a policy of insurance was sui generis.

I imagine that if the substituted beneficiary had been the open and avowed concubine of the insured, the court would have held that the contract was illegal and contrary to good morals and public policy. The court said, referring to the Neal Case, that it could not be reconciled with the long line of decisions, preceding and after it, all holding that the policy or its proceeds never formed any part of the estate of the deceased, except upon the broad principle that it was essentially contra bonas mores to permit a husband and father to waste his substance in insurance premiums for the benefit of his companion in adultery to the prejudice of a legitimate wife and offspring left in necessitous circumstances.

It is impossible to conceive how the last expression of Judge St. Paul on the subject-matter at issue, that of changing a beneficiary, a perfectly lawful contract, both beneficiaries being capable of receiving, can be cited as authority for holding that a man may insure his life in favor of his concubine to the prejudice of his lawful children.

If the holding in this case is permitted to stand, then a man with a wife and lawful children may contract another marriage with his negro maid and take out insurance in her favor to the prejudice of his lawful wife and children, who, perhaps, may be left at his death penniless and objects of public charity.

In my opinion, this decision strikes down all principles of law, of good morals, and of public policy, with respect to contracts of insurance, and that hereafter in making such contracts a person will not be restrained by any principle of law, of good morals, or public

policy, all because insurance contracts are sui generis and not governed by any law except such as are peculiar to insurance.

It scarcely needs citation of authority to show that where an impossible beneficiary is named, or one is named who is incapable by law of accepting, that the insurance goes to the estate or heirs of the insured.

The insurance in this case, to the extent of nine-tenths, according to all laws and principles of good morals and public policy, belongs to the three children of the deceased, as was decreed by the lower court.